UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOSÉPHINE DEGOVE and ANDREA RATFIELD,

                         Plaintiffs,

      v.

 DELTA AIR LINES, INC.,

                       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case No.:


**COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

     Plaintiffs JOSÉPHINE DEGOVE ("Degove") and ANDREA RATFIELD ("Ratfield") (collectively, "Plaintiffs"), by and through their attorneys VALLI KANE & VAGNINI LLP and ELLWANGER LAW LLLP, bring this action for damages and other legal and equitable relief against Defendant DELTA AIR LINES, INC. ("Delta"), for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the New York State Human Rights Law ("NYSHRL"); the New York City Human Rights Law ("NYCHRL"); the Americans With Disabilities Act 42 U.S.C. §§ 12101 *et seq.* ("ADA"); the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01 *et seq.* ("MHRA");; and any other cause(s) of action that can be inferred from the facts set forth herein.

## <u>INTRODUCTION</u>

     1.     On January 1, 1914, the first commercial flight was conducted in the United States by the St. Petersburg-Tampa Airboat Line. More than a century later, the United States airline industry has evolved into a 250 billion dollar industry with state-of-the-art aircraft and approximately 5,500 flights occurring every day. Despite the prodigious evolution of this industry, the treatment of women in the workplace is largely unchanged since 1914 as it remains a male-

*dominated* industry.[1] In fact, despite representing almost 51% of the United States' population, only about 5% of current commercial airline pilots are women.

2.      Delta is one of the most successful commercial airlines in the world. Prior to the COVID-19 Pandemic, its annual revenue was close to 50 billion dollars and over 150 million passengers across the globe fly with Delta every year. In recent years, Delta has publicly taken a stand against workplace inequality with its Chief Executive Officer Edward Bastian ("Mr. Bastian") stating in a January 2020 *Harvard Business Review* Podcast that:

> Business leaders, historically, have been taught to keep their heads down, to not take on social topics and focus on their job. But businesses have a larger voice and a larger impact. I think it's a moral imperative that we pick up that mantle and have the courage and speak.

3.      Mr. Bastian also issued an August 2020 memorandum to his employees stating:

> As your leader, I take ownership of that performance and am committed to correcting our course as we become a more just, equal and anti-racist company.

4.      While Mr. Bastian and Delta certainly vocalize the need for workplace equalities, when confronted with actual discriminatory and harassing behavior from their male pilots (who represent approximately 95% of its pilots), they lose that "courage" to "speak."

5.      Like other airlines,[2] Delta does not promote women and does not protect them from the heinous and unlawful predatory actions of its coveted male pilots.[3] In fact, one male Delta

---

[1] The first female commercial airline pilot was Helen Richey (Ms. Richey") who was hired in 1934 for Central Airlines (now a part of United Airlines). However, there were no other female commercial airline pilots hired after Ms. Richey until 1973 when Captain Emily Warner ("Captain Warner") was hired for Frontier Airlines. Three years later, Captain Warner went on to become the first female airline Captain in the history of the United States—62 years after the first commercial flight.

[2] *See Doe v. Jet Blue Airways Corporation*, 19-CV-1542 (E.D.N.Y. 2019), a lawsuit alleging that male pilots drugged and raped female flight attendants.

[3] One likely reason why commercial airlines like Delta promote male pilots over females is because of the public's backwards stereotypical sentiment towards females operating transportation vehicles such as automobiles and aircraft, which of course, is an unlawful business practice (*i.e.*, acquiescing to customer preference for a certain gender or

Flight Operations Manager wrote to Delta in 2017 that "[i]t appears that Delta may be getting a reputation for having a culture where woman may be subjected to some form of harassment."

6.      For example, in a 2020 recorded voicemail message from a male Delta pilot to a female flight attendant inquiring about becoming a pilot, the pilot professed that the woman "would make a better flight attendant than a pilot" and that "women should not be in the cockpit unless they are giving a blowjob."

7.      This message exemplifies the treatment Plaintiffs and other women were/are forced to endure working for Delta.

8.      Plaintiff Degove, a flight attendant, married one of Delta's male pilots in 2016 and was repeatedly raped by him during their marriage, only to be victimized again by Delta when she reported the assaults to management.

9.      Plaintiff Ratfield, a pilot, suffered through years of sexual harassment ranging from lewd comments about her body to being sexually assaulted by a male pilot.

10.     Both Plaintiffs complained to Delta of their unspeakable treatment, but Delta did not "correct [its] course" as proffered by Mr. Bastian. Instead, it took no corrective action whatsoever, brushing aside its male pilot's unlawful acts under its corporate rug. Moreover, it seemingly promotes this wretched behavior as Plaintiff Degove's husband **received a promotion** from First Officer to Captain after she complained of him raping her.

11.     Inexplicably, Delta did take action, but against *Plaintiffs* for reporting incidents of harassment or assault, by "gaslighting" them and subjecting them to adverse employment actions.

12.     Following Plaintiff Degove's complaint, Delta drove her  out of the position she had held since 2007, when she was accused of being "mentally unfit" for duty, which was untrue.

---

race). For example, a 2013 2,367 person survey conducted by a British travel agency found that 51% of airline passengers would not trust a female pilot.

13.     Following Plaintiff Ratfield's complaints, Delta falsely accused her of abusing alcohol, forcing her to undergo unnecessary and abusive treatment in order to keep her position. If not for Plaintiff Ratfield's union involvement, she would have been terminated.  Instead, Delta demoted her to a First Officer.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201;  (iii) 42 U.S.C. §§ 2000e *et seq.*; and (iv) under 42 U.S.C. §§ 12101.

15.     Venue is proper in this Court pursuant to 42 U.S.C. § 2000e–5(f)(3), in as much as this judicial district lies in a State in which the unlawful employment practices occurred and/or where Plaintiffs would have worked but for the unlawful employment practices complained of herein. The unlawful employment actions complained of herein also affected Plaintiff Ratfield's employment within New York. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), in that Delta maintains facilities, conducts business, and resides in this district.

16.     The Court's supplemental jurisdiction is invoked to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

## THE PARTIES

17.     At all relevant times, Plaintiff Degove was an "employee" within the meaning of Title VII, the ADA, the NYSHRL, and the NYCHRL. She currently resides in San Francisco, California.

18.     During all relevant times, Delta based Plaintiff Degove out of its facilities at John F. Kennedy International Airport ("JFK") located in Queens, New York.

19.     During the relevant time period, Plaintiff Ratfield was an "employee" within the meaning of Title VII, the NYSHRL, the NYCHRL, and the MHRA.  She currently resides in Orono, Minnesota.

20.     During the relevant time period, Delta based Plaintiff Ratfield out of New York City ("NYC") and then out of Minneapolis-Saint Paul International Airport ("MSP") located in Saint Paul, Minnesota.

21.     Plaintiff Ratfield was subjected to sexual harassment while she was based out of NYC and MSP.

22.      During the relevant time period and before Delta took retaliatory action alleged herein against Plaintiff Ratfield, Plaintiff Ratfield performed work as a Captain in Queens, New York by operating aircraft to and from JFK and LaGuardia Airport ("LGA") and by transporting passengers to and from Queens, New York on behalf of Delta. Had Plaintiff Ratfield not suffered the retaliatory actions alleged herein, she would have continued performing work as a Captain on behalf of Delta in Queens, New York.

23.     Delta is a publicly owned corporation organized under the laws of the state of Delaware and has its principal place of business at 1030 Delta Boulevard, Atlanta, Georgia 30354.

24.     Delta transacted and continues to transact business in New York and within New York County by employing persons at JFK and LGA and conducting business within Queens County, New York.

25.     Delta has at all relevant times been an "employer" covered by Title VII, the ADA, the NYSHRL, the NYCHRL, and the MHRA.

26.     At all relevant times, Delta has employed over 70,000 employees.

## EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

27.     Plaintiff Degove, who has herein alleged claims pursuant to Title VII and the ADA, has timely filed a complaint of discrimination/retaliation with the EEOC.

28.     Plaintiff Degove has requested her Notice of Right to Sue letter from the EEOC for the alleged Title VII and ADA claims herein within ninety (90) days of the filing of this Complaint.

29.     Plaintiff Ratfield, who has herein alleged claims pursuant to Title VII, has timely filed three (3) complaints of discrimination/retaliation with the EEOC.

30.     Plaintiff Ratfield has received her Notice of Right to Sue letter from the EEOC regarding her first and second complaints of discrimination/retaliation for the alleged Title VII claims herein within ninety (90) days of the filing of this Complaint.

31.     Plaintiff Ratfield has requested her Notice of Right to Sue letter from the EEOC regarding her third complaint of discrimination/retaliation for the alleged Title VII claims herein within ninety (90) days of the filing of this Complaint.

## STATEMENT OF FACTS

**I.      Delta's Policy and Practice of Weaponizing  Its Mental Health Safety Procedures**

32.     The mental health and sobriety of airline employees is of the utmost importance and there are procedures designed to protect the public and ensure that Pilots and other in-air employees are fit for duty.

33.     Delta, however, uses these public protections with impunity to retaliate against those who complain of its unlawful practices. Delta uses these public protections to retaliate against its employees as it immediately removes them from employment and their failure to comply with Delta's strictures is a death knell to their careers. Accordingly, Delta gains blind compliance from those against whom it wishes to retaliate.

34.     For example, in January 2016, First Officer Karlene Pettit ("First Officer Pettit") complained to Delta of pilot fatigue, falsification of training records, and inadequate training for its pilots. Delta then deemed First Officer Pettit mentally unfit for duty and forced her to undergo a psychiatric evaluation by a physician who Delta grossly paid approximately $75,000 for an approximately $5,000 evaluation. That physician, who has since surrendered his Illinois Medical License in lieu of prosecution, declared that First Officer Petitt was bipolar and, thus, unfit for duty.

35.     First Officer Pettit then received several subsequent psychiatric evaluations, including one from the world-renowned Mayo Clinic, that declared she was not bipolar and perfectly capable of operating an aircraft. In fact, Dr. Lawrence Steinkraus of the Mayo Clinic and former Individual Mobilization Augmentee for the United States Air Force highlighted Delta's unlawful retaliatory practice by stating:

> This has been a puzzle for our group—the evidence does not support presence of a psychiatric diagnosis but does support an

> organizational/corporate effort to remove this pilot from the rolls.
> This [was] not an uncommon problem for me in the AF – wherein a
> line commander would decide they wanted to get rid of a crew
> member but did not want to do it administratively – so they would
> ask for a medical evaluation. Sometimes it made sense, for instance
> a pilot with PTSD, fear of flying, etc. At other times, the intent was
> less benign – a problem of "fit" and, years ago in the military, it was
> not unusual for female pilots and air crew to be the target for such
> an effort.[4]

36.　Of course, Delta refused to accept these findings from First Officer Pettit's physicians.

37.　First Officer Pettit then took legal action, and in December 2020, the United States Department of Labor Administrative Law Judge Scott Morris found that Delta unlawfully retaliated against First Officer Pettit for her complaints of Delta's aviation safety violations. Specifically, Judge Morris found that:

> [I]t is improper for [Delta] to weaponize this [psychiatric
> evaluation] process for the purposes of obtaining blind compliance
> by its pilots due to fear that [Delta] can ruin their career by such
> cavalier use of this tool of last resort.

38.　Like First Officer Pettit, Plaintiffs were also victims of Delta's policy and practice of using processes designed to protect the public to violate the law and mask its illegal actions creating a chilling effect to discourage its female employees from engaging in protected activities as set forth fully below.

## II.　Facts Common To Plaintiffs

39.　Plaintiffs were both employees of Delta during the relevant time period.

40.　In addition to both being sexually assaulted by male pilots during their employment with Delta, Plaintiffs were also subjected to sexualized comments and sexually pursued by male pilots.

---

[4] According to Delta, approximately 50% of its pilot workforce is comprised of former military personnel.

41.     Plaintiffs both complained to Delta of egregious sexual harassment by Delta's male pilots.

42.     Plaintiffs were both falsely deemed unfit for duty by Delta following their complaints of sexual harassment.

43.     Delta required Plaintiffs to undergo treatment and examinations by a medical professional it directly compensates or contributes "donations" to as a result of them falsely deeming Plaintiffs unfit for duty. Delta "weaponized" its mental health safety procedures to retaliate against Plaintiffs.

44.     Plaintiff Degove was ultimately terminated and Plaintiff Ratfield was ultimately demoted in retaliation for their engagement in protected activities, forced to sign a "last chance contract," and forced to work with a male doctor under threat of termination.

45.     Delta retaliated, in a substantially similar manner, against both Plaintiffs for complaining of sexual harassment. Delta's method of retaliation (*i.e.*, deeming a complaining party mentally unfit and then taking further adverse employment actions, including but limited to negatively affecting their income) is a common practice.

## III.     Facts Pertaining to Plaintiff Degove

46.     In 2007, Plaintiff Degove began her employment for Delta as a flight attendant.

47.     During her employment with Delta, Plaintiff Degove was based out of JFK and her Managers were located at JFK.

48.     Plaintiff Degove was born with severe dyslexia, which includes practical dyslexia.

49.     Although Plaintiff Degove's dyslexia substantially impairs her ability to write, it has not had an effect on her employment as a flight attendant. In fact, Plaintiff Degove has received

several personal commendations from Delta's passengers and coworkers throughout her unblemished approximately eleven (11) year career.

50.     For example, in August 2013, a passenger wrote to Delta "to express [his] complete satisfaction with the level of service give [sic] by [Plaintiff] Degove," that Plaintiff Degove's "service is clearly in line with the best [he] had seen," and that "she is clearly an employee that Delta needs to keep."

51.     As another example, in September 2011, a passenger wrote to Delta "to compliment the fantastic service of [Plaintiff] Degove" and that he has "flown for 30 years and millions of miles for business and [Plaintiff Degove] is absolutely at the top as the best flight attendant [he] has ever experienced, including [his] trips with Singapore Air. This passenger further wrote that Plaintiff Degove "was exceptional and if 80% of the attendants were at [her] level of service the customer experience and industry would be transformed."

52.     In 2016, Plaintiff Degove married a Delta pilot.

53.     During the later years of their marriage, Plaintiff Degove was repeatedly raped and physically/mentally abused by her husband.

54.     In 2018, Plaintiff suffered a workplace injury to her rotator cuff and was required to take leave related to her injury. Delta refers to the leave as On the Job Injury Leave or "OJI."

55.     After enduring repeated rapes by her husband, in or about August/September of 2018, Plaintiff Degove escaped and relocated to San Francisco, California.

56.     Within a day of escaping to San Francisco, Plaintiff Degove contacted Delta's Employee Assistance Program ("EAP") to complain that her husband raped her and to seek assistance in dealing with the trauma. During this call, Plaintiff Degove specifically informed Delta of her husband's identity and that he worked for Delta as a pilot.

57.     On September 8, 2020, Plaintiff Degove returned from her OJI ready to finally get back in the air and continue working.

58.     Due to her lengthy absence, however, Delta required Plaintiff Degove to undergo retraining.

59.     Plaintiff Degove successfully completed almost all of her training except for the "doors" test, which concerned, among other things related to an aircraft's doors, sealing the aircraft doors before takeoff.

60.     Plaintiff Degove was unable to complete the "doors" test because of her lengthy two (2) year absence and her dyslexia. Moreover, the training practices changed since Plaintiff Degove went out on OJI further complicating the completion of the test.

61.     On September 9, 2020, Plaintiff Degove was provided with a memo outlining the process of rescheduling her "doors" test and requested that she call Delta's Training Center on September 14, 2020, to reschedule it.

62.     On September 14, 2020, Plaintiff Degove, called Delta to reschedule her "doors" training. Immediately upon calling, Plaintiff Degove was informed that she had to speak with Delta's Nurse. The Nurse then forwarded Plaintiff Degove to Jackie (last name unknown), an EAP Manager.

63.     Jackie instructed Plaintiff Degove that she was required to sign "paperwork" that she was sending her. When Plaintiff Degove inquired why she had to sign this undisclosed paperwork, Jackie responded, "Well don't you know why you are calling me?" and Plaintiff Degove stated, "No." Jackie then inquired, "Well what do you think it's for" and Plaintiff Degove stated, "I thought it was for my dyslexia and the doors." Thereafter, Jackie stated, "you know why, why you have been gone for three (3) years."

11

64.     Plaintiff Degove, however, never received the "paperwork" from EAP.

65.     Also on September 14, 2020, Plaintiff Degove spoke with her JFK Supervisor, Louis Pierrot ("Mr. Pierrot"), who had knowledge of her dyslexia, and requested a disability accommodation for extra time and guidance to complete the "doors" test.

66.     Plaintiff Degove then spoke with Henrietta Archie ("Ms. Archie"), an Accommodation Program Manager, regarding her need for a disability accommodation. Ms. Archie required Plaintiff Degove to submit supporting medical paperwork, which she did. Ms. Archie stated the paperwork was "perfect" and that she would have to go to Plaintiff Degove's Managers to discuss it with them. A week later, however, Ms. Archie claimed that the medical paperwork provided did not include information related to her practical dyslexia and could not give her an accommodation without such information. Plaintiff Degove then resubmitted the medical paperwork that included further information regarding her practical dyslexia despite the original paperwork documenting such. Plaintiff Degove never heard from Ms. Archie again.

67.     On September 15, 2020, on Plaintiff Degove's behalf, Delta made a fraudulent disability leave claim to Sedgwick Group, an insurance broker. Delta filed this claim without Degove's consent or knowledge. The disability leave form that Plaintiff Degove received from Sedgewick Group included a release of her medical records to both Sedgwick Group and Delta. Delta made a disability claim on Plaintiff Degove's behalf either to put her on disability leave and/or to obtain the extremely intimate details of her rapes and subsequent treatment.

68.     Plaintiff Degove complained to Mr. Pierrot regarding this fraudulent disability claim but was ignored.

69.     After September 16, 2020, Plaintiff Degove repeatedly attempted to contact Mr. Pierrot regarding her accommodation and the completion of her training, without avail.

70.     On October 23, 2020, Plaintiff Degove, after being unable to get in contact with Mr. Pierrot, contacted David Gilmartin, Delta's JFK Base Manager, who stated that he would look into it and call her back in an hour.

71.     Mr. Gilmartin never called Plaintiff Degove back. Instead, he sent her an email on October 23, 2020, stating that someone would get back to her next week.

72.     On October 27, 2020, Mr. Gilmartin and Edwin Abelard ("Mr. Abelard"), Delta's Senior JFK Base Manager, contacted Plaintiff Degove via telephone. During this call, Mr. Abelard demanded that Plaintiff Degove needed to complete and execute all "documentation," including a full HIPAA release, provided to her from EAP before she could return to work and be accommodated. Notably, the HIPAA release would have released the intimate and irrelevant details of her sexual assault. She was also informed that she required a psychiatric evaluation by Delta's therapist. Plaintiff Degove then stated that Delta was requiring her to undergo a psychiatric evaluation because of her rapes. Mr. Abelard replied, "Well good, now you know! Now you know why we need to have your sanity checked because you're emotional!"

73.     Immediately following this call, Plaintiff Degove called Jackie as required and to obtain the necessary documentation, but she stated that she would call her back after she spoke with Plaintiff Degove's Supervisors. Jackie, however, never called her back.

74.     Also following this call, Mr. Pierrot emailed Plaintiff Degove stating that she refused to work with EAP and cannot return to work until she does so. Mr. Pierrot also stated that any absence after November 1, 2020, will be considered unexcused and could result in her termination. He further stated that the accommodation process for Plaintiff Degove will not begin until she is cleared to return to work by EAP.

75.     On November 2, 2020, Plaintiff Degove again spoke with Mr. Gilmartin and Mr. Abelard regarding the EAP documentation and her return to work/accommodation. The men then repeated that Plaintiff Degove was required to complete and execute all documentation from EAP, including a HIPAA release, and undergo a psychiatric evaluation before she was permitted to return to work and be accommodated. Feeling as though she was being set up for termination, Plaintiff Degove stated, "I hope this never happens to you." Mr. Abelard thought she said, "I hope this happens to you" (*i.e.*, raped), and became enraged and began screaming at her. He only calmed down after Mr. Gilmartin clarified Plaintiff Degove's statement.

76.     Following this call, Mr. Gilmartin emailed Plaintiff Degove stating that she will need to sign a release of information form with EAP and be working with EAP by November 10, 2020. He also stated that if she chooses not to work with EAP she will not be permitted to return to work and assume that she is no longer interested in working with Delta resulting in her termination.

77.     Plaintiff Degove, however, was unable to get in contact with EAP despite her attempts to do so.

78.     On December 3, 2020, Mr. Gilmartin instructed Plaintiff Degove to contact EAP and sign the medical release that she still was yet to receive by December 7, 2020, or face suspension and termination.

79.     On December 4, 2020, Plaintiff Degove called Jackie to obtain the requisite documents but was told that she could not speak with her until she received "release" from her Managers. Plaintiff Degove also asked Jackie why she did not return her call on October 27, 2020, and Jackie stated that her Supervisors told her not to.

80.     On December 8, 2020, Jackie left Plaintiff Degove a voicemail stating that she now had permission to speak with her. Plaintiff Degove, however, was suspended approximately an hour and a half later.

81.     On December 22, 2020, Plaintiff Degove finally received a HIPAA release from EAP. The release, however, permitted Plaintiff Degove's medical information to be released to Mr. Pierrot and Mr. Gilmartin despite Mr. Gilmartin emailing the following to her on December 3, 2020: "[K]now that none of your specific medical information will be shared with us."

82.     On or around January 12, 2021, Plaintiff Degove received a termination letter from Delta.

83.     At no point from Plaintiff Degove's return from OJI to her termination was she informed that the reason why she required a psychiatric evaluation from an EAP therapist (not a psychiatrist) and had to release her medical information was for legitimate purposes. The only indication Plaintiff Degove ever received as to why Delta was subjecting her to this ordeal was from Mr. Abelard who stated, "Well good, now you know! Now you know why we need to have your sanity checked because you're emotional" in response to her asking him if the psychiatric evaluation requirement was related to her rapes.

84.     Delta had knowledge that one of its pilots repeatedly raped and domestically abused Plaintiff Degove.

85.     Plaintiff Degove was never required to undergo a psychiatric evaluation prior to informing Delta that she was a victim of sexual assault and domestic violence.

86.     Delta forced Plaintiff Degove to undergo a psychiatric exam through Delta for reporting that she was a victim of sexual assault by an employee of Delta and/or because she was a victim of domestic violence.

87.     Despite being repeatedly told that she had to complete forms provided to her from EAP, Plaintiff Degove never received them until after her suspension. The HIPAA release form Plaintiff Degove did receive was incorrect as it improperly released her sensitive medical information to her Supervisors.

88.     On *numerous* occasions, Plaintiff Degove offered to be examined by a neutral psychiatrist not affiliated with Delta, but Delta refused. It mandated that she must be seen by one of its therapists who are less qualified to diagnose mental health fitness than psychiatrists.

89.     Delta retaliated against Plaintiff Degove for her complaints of sexual assault by a male employee of Delta by forcing her to undergo a faux psychiatric evaluation and terminating her in violation of Title VII, the NYSHRL, and the NYCHRL.

90.     Delta discriminated against Plaintiff Degove on her protected status as a domestic violence/sex offense victim by forcing her to undergo a faux psychiatric evaluation and terminating her in violation of the NYSHRL and the NYCHRL.

91.     Delta discriminated against Plaintiff Degove on the basis of her disability by denying her a reasonable accommodation and/or refusing to engage in the interactive process in violation of the ADA, the NYSHRL, and the NYCHRL.

92.     Delta's violations of Title VII, the NYSHRL, the NYCHRL, and the ADA were willful as it has more than adequate knowledge of the foregoing statutes and their requirements.

93.     As a direct result of Delta's unlawful actions, Plaintiff Degove has incurred severe emotional distress that has taken a toll on her physical health. Plaintiff Degove now suffers from depression, anxiety, panic attacks, lockjaw, cardiac ailments, ground teeth, and weight loss.

**IV.    Facts Pertaining to Plaintiff Ratfield**

94.    Plaintiff Ratfield is the co-founder and former President of the non-profit Female Aviators Sticking Together ("F.A.S.T.") organization. F.A.S.T., which is now comprised of over 12,000 female pilots, provides much-needed flight training scholarships to females as well as encouragement and a support network for the marginalized female pilot community. She also assisted in the creation of Delta's first ever maternity policy and nursing/bonding policy for pilots.

95.    In July 1999, Plaintiff Ratfield began her employment for Delta as a flight attendant.

96.    In March 2003, Plaintiff Ratfield resigned from her employment as a flight attendant to become a pilot for Pinnacle Airlines.

97.    In 2005, Plaintiff Ratfield received the Women in Aviation ("WIA") Delta Air Lines Scholarship.

98.    In February 2007, Delta hired Plaintiff Ratfield as a pilot making her, at the time, part of Delta's 3% female pilot workforce.

99.    Throughout her employment with Delta, Plaintiff Ratfield received exceptional reviews from her passengers.

100.    For example, a "Million Miler" stated to Delta that "I am a million miler – plus and I have never seen a better job of 1) communication combined with 2) flying an aircraft and 3) handling bad weather than this. From speaking with all of us at the gate to showing us on an I-pad the radar of the weather, to asking if there were questions --- to announcements in flight --- 40 yrs. as a passenger – the best!!"

101.    As for another example, one passenger stated to Delta that "[t]he female captain on this flight was by far the best pilot I have ever had. She was clear and concise with her

announcements. She was friendly and made a smooth landing in what was rainy nasty day weather wise."

102.    As for a further example, a different passenger stated to Delta that "Staff was excellent on every leg of my journey. I witnessed one of the pilots [Plaintiff Ratfield] assisting passengers with questions at the Des Moines terminal. [Plaintiff Ratfield] in Detroit was masterful at keeping the mood light while providing excellent customer service:) [sic]."

103.    As for a fourth example, on February 5, 2020, a passenger stated to Delta, "I'm sure that Delta's expectations for flying officers are rather high and demanding.  But Captain Ratfield . . . [is] obviously a step or two beyond this.

104.    In February 2007, during her initial pilot training, a doctored photograph of Plaintiff Ratfield at the WIA conference circulated that depicted Plaintiff Ratfield being dreamed of by Brian Bolt, a Male New Hire Delta Manager. Plaintiff Ratfield reported this doctored image to Delta, but no remedial action was taken.

105.    In May 2007, a list of Delta's pilots who had been awarded new aircraft was circulated. Plaintiff Ratfield's name was circled with the word "actress" with the image of a tongue next to it.

106.    On July 16, 2007, during international flight line training, Captain Richard Stark ("Airman Stark"), a Line Check Airman, repeatedly called Plaintiff Ratfield's hotel room asking to have a drink with her. He also showed up at her door at approximately 2:00 am to request that she drink with him. Plaintiff Ratfield declined Airman Stark's invitation. The following day, Airman Stark belittled and demeaned Plaintiff Ratfield in the flight deck and made a false report regarding her performance. Plaintiff Ratfield reported to Delta regarding Airman Stark's unlawful retaliatory actions, but no remedial action was taken.

107.    In or around 2008, during a layover in Sao Paulo, Brazil, Captain Paul Eberly ("Captain Eberly") pointed out a shirt on a person that stated, *"Two in the front, one in the rear,"* with fingers to suggest a sexual connotation. Thereafter, Captain Eberly made this finger gesture whenever he saw Plaintiff Ratfield and/or flew with her again. She reported Captain Eberly to the NYC Chief Pilot Office ("CPO"), but no remedial action was taken.

108.    In March 2010, Captain Greg Mazyck informed Plaintiff Ratfield that she was being spoken about in a sexual manner amongst the NYC Pilots. Plaintiff Ratfield complained of this unlawful conduct to former Manager Brian Bolt, but no action was taken.

109.    On February 25, 2011, due to Delta's non-existent policies protecting nursing mothers, Plaintiff Ratfield was required to pump her breast milk while on crew rest in the flight deck next to Captain Gordon Goss ("Captain Goss"), a Line Check Airman. Upon completing her pumping, Captain Goss turned around and saw Plaintiff Ratfield's exposed breasts. Following this incident, Captain Goss smirked whenever he saw Plaintiff Ratfield. Captain Goss later became one of Ratfield's direct supervisors, and he also informed Delta's Regional Director Captain Gregory Cardis ("Captain Cardis") and Captain Ray Baltera ("Captain Baltera") that he saw Plaintiff Ratfield's breasts.

110.    Furthermore, during a 2016 Union meeting, Plaintiff Ratfield presented a resolution for a maternity, nursing, and bonding policy to the Minneapolis-Saint Paul ("MSP") pilots to prevent the horrific workplace conditions for mothers of newborns. Captain Goss sat in the front row during this meeting and smirked the entire time.

111.    On July 29, 2011, during a 2-day trip, an MSP Captain told Plaintiff Ratfield to buy a hat because she forgot hers at home.  Instead, she asked for a temporary replacement hat from the MSP CPO, and when the MSP CPO did not have a hat, this MSP Captain again demanded that

she purchase one. During her 2-day trip with the MSP Captain, he repeatedly called Plaintiff Ratfield a "princess" for seeking a temporary replacement hat during the flight.  At the end of the flight, he stated that he did not like the fact that she looked so "girly in her uniform" and that she must just be a "princess" because she forgot her hat.  Plaintiff Ratfield reported the incident to MSP CPO and, again, nothing was done.

112.    On August 30, 2015, during a layover in Washington D.C., First Officer Aubrey Venable ("First Officer Venable") said that Plaintiff Ratfield needed a "nipple to suck down [her] drink." Plaintiff Ratfield requested that First Officer Venable cease making offensive comments and turned away from him. First Officer Venable then came up behind her, reached around her body, grabbed both her breasts, and exclaimed "I found your nipples!"  Plaintiff Ratfield reported this incident to her Captain John Sollinger the following day, but no remedial action was taken.

113.    In April 2016, Captain Cardis, other male pilots, and Captain Baltera discussed the fit of Plaintiff Ratfield's uniform pants. Grotesquely, Captain Baltera used the offensive sexual term "camel toe" to describe the fit of Plaintiff Ratfield's uniform pants.

114.    On May 17, 2016, Plaintiff Ratfield was picked by Delta for a photoshoot to model its uniforms. Despite her uniform being approved by Delta's Flying Ops Program Manager Michael Williams before the photoshoot, Delta elected not to use her photos because of the way the uniform displayed her female body.

115.    In September 2016, Plaintiff Ratfield spoke with then Vice-President of Flight Operations Captain Jim Graham ("Captain Graham") about the lack of female options and/or uniforms for their female pilots.

116.    On October 2, 2016, Plaintiff Ratfield was reprimanded by Delta for wearing pink breast cancer epaulets. Although she informed Delta that multiple male pilots have worn similar

pink epaulets without repercussions, a report of the incident was still placed in Plaintiff Ratfield's file.

117.    On January 6, 2017, former Vice President – Flight Operations & System Chief Pilot Captain O.C. Miller ("Captain Miller") wrote all Delta Regional Directors about F.A.S.T.

118.    On June 30, 2017, NYC CPO Manager Captain Jim Dwyer ("Captain Dwyer") sent Plaintiff Ratfield an article regarding sexual harassment, acknowledging what she was being subjected to, stating, "See the third paragraph for what I perceive may be occurring in your professional life."  The third paragraph of the article stated as follows:

> The more a woman conforms to traditional gender norms, the more likely she is to experience benevolent sexism. The more she threatens them, the more likely she is to experience hostile sexism. Take sexual harassment, a particularly violent form of hostile sexism . . . The women most vulnerable to sexual harassment are those "with relatively masculine personalities (*e.g.*, assertive, dominant, and independent)" and those who perform jobs traditionally done by men.

119.    On June 7, 2017, Captain Dwyer wrote his direct supervisor and the rest of the NYC CPO to inform them of multiple cases of overt sexual harassment and about F.A.S.T.

120.    Throughout 2016 and 2017, Plaintiff Ratfield continued to report the harassment she was receiving to Delta's Manager First Officer Crystal Barrois ("First Officer Barrois"). Although First Officer Barrois "agreed" with Plaintiff Ratfield's complaints and was "personally sick" of the sexually hostile work environment fostered by Delta, nothing was done to address Plaintiff Ratfield's complaints other than the campaign of retaliation Delta engaged in as set forth below.

121.    On September 26, 2017, Plaintiff Ratfield was repeatedly raped during a female aviation event in New York City.  In October 2017, she reported the rapes to Captain Scott Monjeau ("Captain Monjeau") and asked for his assistance dealing with the stress caused by the

rapes, the constant sexual harassment, and repeated gender discrimination. Plaintiff Ratfield also advised Captain Monjeau that she was drinking to deal with the rapes and he encouraged her, without explanation, to enter into the Human Intervention Motivation Study ("HIMS")/Delta Pilots Assistance Committee ("DPAC") program and claimed she would get the help that she needed, that it would be a quick 5-weeks "Pilot Program" and that she would be "in-and-out."

122. Notably, Plaintiff Ratfield would have never voluntarily entered the HIMS program had Captain Monjeau explained the details of it.

123. Approximately a week later, Plaintiff Ratfield contacted the Talbott treatment facility regarding the HIMS program, as an error was made in her start date. Thereafter, Captain Monjeau called Plaintiff Ratfield to scream at her for not "going through him" and to not call Talbott again because he was going to take care of everything, including the details of her treatment.

124. In October 2017, "Captain Miller" called Female Aviators Sticking Together ("F.A.S.T.") a "group of angry venting female Pilots." F.A.S.T. is an organization co-founded by Plaintiff Ratfield that provides much-needed flight training scholarships to females as well as encouragement and a support network for the marginalized female pilot community. F.A.S.T. is now comprised of over 12,000 female pilots.

125. On October 24, 2017, Plaintiff Ratfield checked into the Talbott treatment facility. No Manager and/or Union Representative of Delta met Plaintiff Ratfield, despite the fact it is standard to do so for pilots. The 72-hour assessment was also not completed. After checking in, Plaintiff Ratfield was informed that she could not participate in the five-week rehabilitation program due to her gender and the sexually predatory nature of the men in the program. Instead, she was required to enter into an initial eight (8) week rehabilitation program, yet she was still

required to be in the same classes with the "sexually predatory" men. Notably, during the treatment, Plaintiff Ratfield's counselors instructed her not to report sexual harassment to Delta and to "just get through it." Additionally, during treatment, a male Delta pilot nicknamed "Big Mike" was in a relationship with a female inpatient, yet no disciplinary action was taken and "Big Mike" was discharged successfully.

126.    In mid-November 2017, before Delta's required "mid-phase" treatment meeting, Delta's Regional Director Captain Gregory Cardis ("Captain Cardis") falsely told the counselors and physicians that Plaintiff Ratfield has a "known history" of "violating chain-of-command." Notably, Delta does not maintain a "chain of command" because it implements an open door policy.  These false claims resulted in Plaintiff Ratfield being required to receive up to a total of twelve (12) weeks of treatment at Talbott before she could even be considered to return to work by Delta.

127.    In December 2017, Plaintiff Ratfield began receiving severe, crude, and unsolicited sexually offensive text messages, photographs, and a video from male patient(s), which she reported.

128.    On December 14, 2017, despite being only weeks away from completing the program, Plaintiff Ratfield was involuntarily transferred to MARR Addiction Treatment Center, a facility where Captain Graham and current Vice-President of Flight Operations Captain Patrick Burns ("Captain Burns") are/were Board Members, "to protect her" from certain male patients at Talbott. On the drive to MARR, Captain Monjeau admonished Plaintiff Ratfield and told her to keep her "Fucking nose clean." Plaintiff Ratfield was then required to complete another 90 days of inpatient treatment.

129.     On January 24, 2018, Plaintiff Ratfield received an email from Captain Dwyer stating that Captain Baltera had reported to him that she had been transferred to MARR violating Delta's "Rules of the Road" by breaking confidentiality.

130.     On January 31, 2018, Plaintiff Ratfield reported to Captain Dwyer how scared she felt at MARR, and how she was "so scared that there are managers [*i.e.*, males] at Delta that don't want [her] to return to work at Delta. Ever." She also inquired why she is being "talked about as much as [she] has by the men at Delta?"

131.     On March 13, 2018, Plaintiff Ratfield had a three (3) hour meeting at MARR with Captain Cardis, Captain Monjeau, and First Officer Warren Mowry ("First Officer Mowry") regarding the unlawful sexual harassment she was subjected to throughout her career with Delta. Again, no remedial action was taken.

132.     On March 14, 2018, Plaintiff Ratfield was discharged from MARR.

133.     On March 21, 2018, Plaintiff Ratfield asked Captain Monjeau and First Officer Mowry what the "specific reason" was for being "given Dr. [Alan] Kozarsky, as an AME" despite it being previously mentioned by them that it was either Dr. Faulkner or Dr. Harper, Jr. who would serve as her HIMS AME. The day prior, Dr. Kozarsky, an Ophthalmologist, told Plaintiff Ratfield that she was required to fly to Atlanta to visit him prior to her First Class Medical appointment in May 2018.

134.     On July 11, 2018, Plaintiff Ratfield texted Delta's Manager Captain Kathaleen Wildhaber stating the fear she has of Captain Cardis retaliating against her by jeopardizing her employment with Delta every time she has to see him for her required monthly Chief Pilot appointments.

135.     On August 22, 2018, Captain Cardis admonished Plaintiff Ratfield for two hours regarding her complaints during the March 13, 2018, meeting. Captain Cardis also threatened Plaintiff Ratfield's employment and stated that he would leave his opinion in her file because he wanted future Chief Pilots and Delta's management to know how he felt about her.

136.     In the summer of 2019, Manager ATL CPO Captain Harry Miller ("Captain H. Miller") asked Plaintiff Ratfield out on a date for "burgers and a beer" while at work.

137.     On November 15, 2019, Plaintiff Ratfield met with MSP Assistant Chief Pilot First Officer Andy Luce ("First Officer Luce") for her required monthly Chief Pilot appointment in which he stated, "Great meeting with Andrea today… No problems noted."

138.     On November 17, 2019, Plaintiff Ratfield delayed a flight (Seattle-Phoenix) due to maintenance issues and incorrect maintenance logbook write-ups/MEL. This was her last flight flown before the false-positive test result.

139.     On November 19, 2019, Plaintiff Ratfield received her First Class Medical Certificate from Dr. Kozarksy with a positive review stating that "she is sober" and that there were "no concerns at this time." Plaintiff Ratfield also provided a urine sample during her examination, which could have been used for alcohol testing. Later that day, however, Michele Gable ("Ms. Gable") notified Plaintiff Ratfield of a "random" PEth test, which was a non-standard timeframe test as exemplified by Plaintiff Ratfield's Delta Pilot Alcohol and Drug Recovery Program Aftercare Contract ("Contract A"). This PEth test, however, was sent to the wrong address and Ms. Gable rescheduled the test for November 21, 2019, at a third-party lab. However, when Plaintiff Ratfield arrived at the lab, it did not have the Choice Labs' Whole Blood Analysis PEth test kit. Thus, she had to take a non-controlled Blood Spot PEth test that is notorious for its false

positives.  A non-controlled test is a violation of Delta's own policy requiring controlled tests and the test came back positive despite Plaintiff Ratfield not having consumed any alcohol.

140.    On November 26, 2019, Plaintiff Ratfield was notified of a positive PEth test result from Captain Baltera and was taken off flight status. There was no initial re-run of the test, Plaintiff Ratfield was not provided with an opportunity for a confirmatory test despite her requests, and Delta refused to provide the litigation package containing the testing procedures and results and factual data surrounding the test for almost a year. All of the above accommodations have been provided to male pilots. That same day, Plaintiff Ratfield, on her own accord, returned to the same lab and had another PEth test taken at a significantly lower alcohol level of detection and the results were negative. Plaintiff Ratfield provided these results to Delta, but Delta rejected the results. Dr. Kozarksy also refused to provide her with a confirmatory test, despite the late Dr. Harper, Sr., Delta's former HIMS AME, permitting additional testing for male pilot(s) when there was a question about a test result.

141.    Notably, Captain H. Miller afforded Captain Michael Perez ("Captain Perez") a secondary test, and the late Dr. Harper Sr. permitted Captain Perez to undergo further testing after a *second* positive test result. Unlike Plaintiff Ratfield, Captain Perez was not required to attend retreatment or execute a "last chance" agreement. Moreover, in 2016, a male pilot, Michael R. (last name unknown), incurred a DUI and was not required to enter Delta's HIMS/DPAC program, execute a Contract "A," or be seen by a Delta contracted HIMS AME. Rather, Delta only required him to be monitored by his AME for two years. This AME was not contracted by Delta like Dr. Kozarsky was/is.  This option was never offered to Plaintiff Ratfield who *voluntarily* entered the HIMS program for the purpose of sexual assault counseling.

142.    On November 26, 2019, before her second test, Captain Monjeau, ordered Plaintiff Ratfield not to obtain additional testing. This order conflicts with Delta's HIMS/DPAC two-test protocol, and recommendations for male pilots in similar cases.

143.    On November 27, 2019, Plaintiff Ratfield took a Whole Blood PEth test and Hair Follicle test at a hospital and both were negative. The hair follicle test has an up to 90-day retrospection. Plaintiff Ratfield informed Delta's management, but they did not accept the results despite accepting (and even asking for) secondary results from male pilots.

144.    On December 10, 2019, Plaintiff Ratfield took a fingernail test, which has an up to 180-day retrospection, and the results were again negative. Once again, Plaintiff Ratfield informed Delta's management, but they would not accept the result.

145.    On December 10, 2019, Captain Baltera directed Plaintiff Ratfield to report to The Meadows treatment facility in Phoenix, Arizona, which no pilot has ever previously attended, for a minimum of forty-five days. By no coincidence, Jennifer Angier, the Talbott Chief Executive Officer during Plaintiff Ratfield's admittance, was now the Vice President of Behavioral Health at The Meadows.

146.    On December 11, 2019, Plaintiff Ratfield spoke with Captain H. Miller regarding Captain Perez. Captain Miller denied any knowledge of his workings with Captain Perez and told her just to "take the easy route" and receive treatment.

147.    On December 12, 2019, Plaintiff Ratfield emailed Captain Graham asking for help and also reporting the discriminatory treatment.

148.    On December 15, 2019, Plaintiff Ratfield was interviewed by Captain Baltera on a 25-minute Sunday phone call. Plaintiff Baltera questioned her regarding her children's custody arrangements, divorce details, and childcare issues. Plaintiff Ratfield reiterated that even though

she did not drink, nor "slip," nor relapse, that she was open to a mutually agreeable solution to maintain her employment with Delta. She then again suggested Hazelden Betty Ford since it is a world-renowned treatment facility in the Minneapolis area. This plan would have afforded her the ability to see her children as well as comply with her Family Medical Leave Act leave requirements on file with Delta. Despite not needing it, Plaintiff Ratfield never refused retreatment.

149.    On December 19, 2019, Plaintiff Ratfield received a toxicologist report from Dr. David Koch from Grady Memorial Hospital and Emory University, stating that the "Nov. 21st specimen is in serious doubt." Delta, however, did not accept these findings.

150.    On December 23, 2019, Plaintiff Ratfield was interviewed by Captain Baltera and MSP Chief Pilot Paul Borgstrom. During this 3-hour meeting, Captain Baltera asserted that Plaintiff Ratfield "flushed her blood" to garner the negative results and stated that the PEth may have a half-life of 1-day in her blood, effectively accusing her of showing up to her HIMS AME appointment intoxicated. Later that day, Dr. Kozarsky informed Plaintiff Ratfield that she was required to see a HIMS Psychiatrist because she was maintaining her innocence and because Dr. Kozarsky stated she was "in denial."

151.    On December 27, 2019, Captain Baltera informed Plaintiff Ratfield that she was terminated and that she must attend a meeting for the notice of intent to terminate ("NOI"). Also on December 27, 2019, Dr. Kozarsky told Plaintiff Ratfield to attend in-patient treatment to make it "easy" on herself because Delta and the Federal Aviation Administration ("FAA") do not like pilots who do not go to treatment and that she would be up against a "big company" and "big government."

152.    On January 1 and 2, 2020, in a 14 hour period, Captain Baltera emailed Plaintiff Ratfield three times, delivering her NOI non-standard via email, with each email increasing in a

threatening tone, stating, "As your supervisor, I am directing you to acknowledge receipt of this email." In addition, the NOI was filled with falsities that lacked any supporting documentation to include that Plaintiff Ratfield had "refused retreatment" and that her stay at Talbott was "characterized" by rule violations and disruptions, all of which are completely without merit.

153.    On January 16, 2020, Dr. Kozarsky informed Plaintiff Ratfield that he was not part of the decision making that Plaintiff Ratfield attend inpatient treatment at The Meadows despite the fact that the NOI Plaintiff Ratfield received stated as such ("[Y]our HIMS AME agreed that re-treatment at the Meadows was appropriate.").

154.    On January 21, 2020, Plaintiff Ratfield emailed Delta Mr. Bastian, Delta's Ethics and Compliance, and Delta's Executive Vice President – Flying/Air Operations Bill Lentsch ("Mr. Lentsch") requesting assistance and reported the sexual harassment, gender discrimination, and retaliation she was subjected to throughout the years of her employment with Delta and her looming retaliatory termination. She also reported Dr. Kozarsky's conflict of interest with Delta as an FAA designee and the fact that he was forcing her to undergo a psychiatric evaluation because she maintained her sobriety. Moreover, as an FAA designee, Dr. Kozarksy is not permitted to refer pilots to a specific treatment facility.  This regulation apparently did not apply to Plaintiff Ratfield.

155.    On February 11, 2020, Plaintiff Ratfield received a toxicologist report from Theodore F. Shults, Chairman of the American Association of Medical Review Officers, stating that  "All of the relevant testing done after the November 21, 2019, indicate alcohol abstinence and point to the November 21, 2019 PEth as a false-positive result." Delta, however, did not accept these findings.

29

156.    On February 12, 2020, Plaintiff Ratfield met with Captain Burns of the falsities contained in the NOI and reported the sexual harassment at Talbott. She also questioned why Delta chose to send her to The Meadows. Captain Burns outright refused to listen to the preponderance of evidence that demonstrates Plaintiff Ratfield's innocence.

157.    On March 9, 2020, Delta's Human Resources Employees Amy Bondurant ("Ms. Bondurant") and Nicole Bell ("Ms. Bell") met with Plaintiff Ratfield in a 3-hour meeting to discuss her allegations of sexual harassment, gender discrimination, and retaliation. Delta denied Plaintiff Ratfield the right to have any representation with her.

158.    On March 16, 2020, Plaintiff Ratfield provided Captain Burns and Ms. Bondurant a chart detailing discrimination between male and female pilots regarding alcohol/drug testing, but did not receive a response.

159.    On April 8, 2020, Plaintiff Ratfield's First Class Medical Certification was revoked. That same day, the FAA spoke with Ms. Gable of Delta-contracted Choice Labs regarding Plaintiff Ratfield's case, which is not a standard practice.

160.    On April 21, 2020, Plaintiff Ratfield contacted Ms. Bondurant again regarding being discriminated against for not receiving the November 21, 2019 litigation package.

161.    On April 22, 2020, Plaintiff Ratfield called Dr. Thomas Faulkner ("Dr. Faulkner"), HIMS AME, and Delta's Director of Health Services asking for assistance with Dr. Kozarsky's unethical actions and behavior. Dr. Faulkner claimed that he wears "two different hats," and that neither of his roles affects the other. Plaintiff Ratfield then explained her case in detail and asked if Dr. Faulkner would consider being her HIMS AME because Dr. Kozarsky was clearly trying to harm her and her career and had stopped her FAA-required monitoring (random drug/alcohol screens). Dr. Faulkner agreed to be her HIMS AME and scheduled a Zoom call on April 29, 2020.

162.    On April 29, 2020, Plaintiff Ratfield had the Zoom video call with Dr. Faulkner and discussed her case in further detail and the steps needed to reacquire her FAA Special Issuance First Class Medical. Dr. Faulkner agreed to restart Plaintiff Ratfield on the required FAA random alcohol testing.

163.    On April 30, 2020, Captain Burns rescinded Plaintiff Ratfield's notice of termination on the condition she attends inpatient retreatment and executes a "last chance" agreement, which was not imposed upon male pilots (*e.g.*, Captain Michael Perez). The required inpatient treatment directly violates Plaintiff Ratfield's FMLA on file pertaining to her son that states "patient (Hunter) displays extreme stress over mother's absence for long periods of time decreasing patient's ability to learn effectively resulting in decrease effectiveness of therapies," and that he is "unable to perform daily activities and school activities w/out significant aid."

164.    In May 2020, Plaintiff Ratfield provided Delta with the results from a polygraph test affirming that she has sustained sobriety, three expert toxicologist reports, and other supporting documentation. Once again, Delta refused to acknowledge Ms. Ratfield's sobriety.

165.    On May 3, 2020, Plaintiff Ratfield emailed Captain Burns and again requested intensive outpatient treatment again so she could ensure adequate childcare and FMLA compliance for her sons and to remain on her current "Contract A," but was denied.

166.    On May 7, 2020, Plaintiff Ratfield emailed Captain Burns and requested that she no longer be required to use Dr. Kozarsky and Choice Labs as her testing facility and suggested a neutral HIMS AME or Dr. Faulkner, but was denied with the threat by Captain Burns that "any additional attempts to delay reporting will cause us to re-open the disciplinary process."

167.    On May 11, 2020, Plaintiff Ratfield emailed Ms. Bondurant regarding her concerns of working with the male employees who she complained about for engaging in unlawful activities and being forced to see Dr. Kozarsky.

168.    On May 20, 22, and 29, 2020, Plaintiff Ratfield spoke with and emailed Captain Baltera, Captain Borgstrom, and Captain Burns to postpone her Hazelden start date by two weeks to secure adequate childcare, but was denied.

169.    On June 1, 2020, Captain Burns denied Plaintiff Ratfield's request to not work with employees who she complained of sexually harassing her.

170.    On June 1, 2020, Plaintiff Ratfield checked into the Hazelden Treatment Center and was informed that Delta advised them to simply admit her without a given diagnosis. Also on June 1, 2020, Dr. Kozarksy contacted Hazelden Counselor Chinelo Steiner ("Ms. Steiner") and informed her that Plaintiff Ratfield must have some sort of psychological problems and/or a personality disorder.

171.    On June 15, 2020, Dr. Kozarsky again contacted Ms. Steiner to attempt to negatively impact Plaintiff Ratfield's evaluations. When his malicious efforts failed, Dr. Kozarsky told Ms. Steiner that Plaintiff Ratfield had "really rubbed some people the wrong way" and that "this must be the good ol' boys club after all."

172.    On June 22, 2020, Plaintiff Ratfield again emailed Delta to request a HIMS AME change due to Dr. Kozarsky's unethical and unlawful behavior. Also on June 22, 2020, Plaintiff Ratfield lodged another request to the FAA for a HIMS AME change. The FAA permitted Plaintiff Ratfield to change HIMS AME to Dr. Stacy Berckes ("Dr. Berckes"), but first required Dr. Kozarksy to release her by providing his rationale as to why he wished to retain her, which he did not do.

173.     On June 23, 2020, Dr. Kozarksy released Plaintiff Ratfield, and Plaintiff Ratfield advised Delta of this during the "mid-phase" conference call of the FAA's approval of her HIMS AME change to Dr. Berckes. Also on June 23, 2020, during the "mid-phase" conference call with Hazelden, Captain Baltera, Captain Monjeau, and First Officer Mowry provided Hazelden with part of an alcohol test with no name mentioned and alleged that it was Plaintiff Ratfield's. Notably, this alcohol test was in Delta's possession without Plaintiff Ratfield's acknowledgment, authorization, or consent. Delta attempted to use this test to convince Hazelden that Plaintiff Ratfield was lying and not in remission. Hazelden, however, refused to change its "in sustained remission" diagnosis.

174.     On June 24, 2020, Captain Monjeau called Hazelden and requested that the test provided to Hazelden be destroyed, which is noted in Plaintiff Ratfield's medical report.

> At the request of Scott Monjeau from Delta Airlines, copy of PeTH Test sent by him was destroyed on 6/24/20

175.     On June 26, 2020, Plaintiff Ratfield emailed Mr. Bastian, Executive Vice President and Chief People Officer Joanne Smith ("Ms. Smith"), Mr. Lentsch, Ms. Bondurant, Ms. Bell, Captain Burns, and Senior Vice President John Laughter ("Mr. Laughter") reporting Delta's retaliatory actions.  Plaintiff Ratfield also requested to no longer work with the individuals that were retaliating against her such as Captains Baltera, Monjeau, and Mowry.

176.     On June 28, 2020, Captain Monjeau and Captain Baltera called Hazelden and attempted to cover up their retaliatory efforts as demonstrated by Hazelden's notes:

> Pt's referents called me on a conference call to discuss a previous conversation I had with Scott Monjeau. Initially Captain Monjeau requested that we destroy any copies of the PEth test he sent to me, stating "That test is the property of Delta." During this call however, Captain Baltera inferred that I must have misunderstood, that they do not need any test results destroyed. I expressed confusion, as Captain Monjeau was very clear in his instructions to me previously,

> and he apologized for any confusion he caused. They once again
> pushed the tx team to consider the PEth test they sent us as a
> positive, despite that fact that Delta does not even consider it a
> positive. I let them know that we would continue to use evidence-
> based practices to help the patient continue with her recovery.

177.   On June 29, 2020, Plaintiff Ratfield was discharged from Hazelden.  Plaintiff
Ratfield also wrote Mr. Bastian about Delta's retaliatory actions against her.

178.   On July 15, 2020, Plaintiff Ratfield received her First Class Medical Certificate
from Dr. Berckes, her new HIMS AME, pending final approval from the FAA.

179.   On August 3, 2020, the night before the execution of the "last chance" agreement,
Delta's Managing Director Flying Operations Captain Wayne Cochran ("Captain Cochran"),
notified the Air Line Pilots Association International ("ALPA") that Plaintiff Ratfield was required
to be seen by Dr. Kozarsky once again despite receiving approval from the FAA to be seen by Dr.
Berckes. Moreover, Captain Cochran claimed that Delta contacted Dr. Quay Snyder ("Dr.
Snyder"), the President of the Aviation Medicine Advisory Service (the aeromedical advisor of
the ALPA) and that he *recommended* that Dr. Kozarsky should remain as her HIMS AME. On
August 4, 2020, however, Dr. Snyder emailed the ALPA to state that "at no time did [he] advise
or offer any opinion about whether or not a change in HIMS AMEs was appropriate for Plaintiff
Ratfield."

180.   On August 4, 2020, Plaintiff Ratfield informed Captain Cochran and Captain
Baltera that she felt unsafe working with Dr. Kozarsky due to his unlawful, unethical, and
retaliatory treatment.

181.   On August 7, 2020, Delta denied Plaintiff Ratfield's request to remain with Dr.
Berckes despite the FAA not requiring a pilot to see a specific HIMS AME.

182.    On August 12, 2020, Plaintiff emailed Ms. Bondurant, Ms. Bell, and Ms. Smith to complain that Delta's refusal to permit her to see a female HIMS AME was discriminatory and of the retaliatory actions Delta was taking against her.

183.    On August 31, 2020, Delta required Plaintiff Ratfield to make a request to the FAA that Dr. Kozarksy becomes her HIMS AME within 48 hours.

184.    On September 1, 2020, ALPA informed Delta that they do not agree with its decision to force Plaintiff Ratfield to utilize Dr. Kozarsky as her HIMS AME. Especially in light of Delta's policy that a HIMS AME is to be decided upon by "mutual agreement" between the Company and the ALPA.

185.    On September 17, 2020, the Federal Air Surgeon reinstated Plaintiff Ratfield's FAA First Class Medical Certificate.

186.    In late September 2020-early October 2020, Delta did not reinstate her flight status, but rather required/requested her full in-patient medical records containing mental health information and medical disorders of her family members from Hazelden.

187.    On October 30, 2020, ALPA filed a formal grievance regarding the forced signing of the "last chance" agreement and to remedy the unlawful harm to which Plaintiff Ratfield was subjected.

188.    On November 27, 2020, Plaintiff Ratfield was notified that she was being displaced to First Officer on a new aircraft despite her return to active flying status as a Captain.

189.    On November 30, 2020, Plaintiff Ratfield had an in-person meeting with Captain Burns in Atlanta regarding the removal of her grievance from her "last chance" agreement. During this meeting, Captain Burns demanded that Plaintiff Ratfield tell him how she learned of Captain Perez and refused to answer why Delta did not abide by the two-test protocol baselessly claiming

that Delta followed protocol. Plaintiff Ratfield also stated she is not comfortable and is fearful of the MSP CPO.

190.    On December 12, 2020, Captain Baltera denied Plaintiff Ratfield's request to remain as a Captain. Notably, in or around January 2020, Captain Baltera backdated 25:40 hours of her Company Administrative leave ("CADM") status in December 2019 to SICK status. As a result, Plaintiff Ratfield was demoted to First Officer because of Delta's retaliatory backdating of the SICK status forced her onto disability and prevented her reinstatement rights in September 2020. Furthermore, Plaintiff Ratfield was not reissued the full 240 hours of sick leave in June 2020 nor was permitted to us the following year's sick leave as is standard practice.

191.    On December 21, 2020, Captain Burns denied Plaintiff Ratfield's grievance.

192.    On December 30, 2020, Plaintiff Ratfield emailed Mr. Laughter regarding: (i) Captain Chris Storbeck's, the author of Delta's Flight Operations Substance Abuse Policy, testimony that the DPAC/HIMS Program was designed to be a two test program; (ii) her negative PEth tests, Hair Follicle and Fingernail tests and Delta's refusal to accept them; and (iii) Captain Baltera retaliating against her for her complaints of sexual harassment by effectively demoting her and refusing to reinstate her to Captain despite his ability to do so.  Again, no remedial action was taken by Delta in response to Plaintiff Ratfield's protected complaints.

193.    On January 1, 2021, Captain Steve Sullivan ("Captain Sullivan") contacted Plaintiff Ratfield and he informed her that he received a positive urine test and Delta attempted to make him admit to drinking alcohol. When he refused, Delta permitted him to take a secondary test, unlike Plaintiff Ratfield. Captain Sullivan's secondary test was negative and Delta accepted it. His negative secondary test was also eight days after his positive test. Plaintiff Ratfield's negative secondary test that Delta refused to accept was only five days after her false-positive test.

36

Remarkably, Captain Baltera kept Captain Sullivan on CADM status during this process whereas Plaintiff Ratfield's status was changed from CADM to SICK.

194.    On January 2, 2021, Plaintiff Ratfield informed Mr. Bastian, Ms. Smith, Mr. Lentsch, Mr. Laughter, and Captain Burns of the foregoing and that the only difference between her and Captain Sullivan was that she complained of sexual harassment and retaliation to Delta. Neither of these individuals provided a substantive response.

195.    On January 12, 2021, Plaintiff Ratfield attended her First Class Medical Certificate appointment with Dr. Kozarsky. At this appointment, Dr. Kozarsky shockingly **required Plaintiff Ratfield to remove her shirt and bra** to simply listen to her lungs. Plaintiff Ratfield reported this heinous and unnecessary incident to Mr. Bastian, Ms. Smith, Ms. Lentsch, Captain Cochran, Mr. Laughter, Captain Burns, and Captain Baltera, but nothing was done. Upon information and belief, Dr. Kozarsky does not require this of all his female patients, further evidencing Delta's retaliatory intent.

196.    On February 22, 2021, Mr. Cochran again denied Plaintiff Ratfield's request to not be required to work with Dr. Kozarsky.

197.    On March 17, 2021, during Plaintiff Ratfield's pre-flight from London to Atlanta, she got up from her seat to stretch her back and one of the male pilots asked if her back hurt. Another male pilot then asked if she had tried an inversion table. Thereafter, Line Check Airman Captain Joseph Gilroy who was training Plaintiff Ratfield stated, "I'd like to see my wife inverted every morning" to Captain Gary Mavity, the other Line Check Airman on the flight, and First Officer Michael Floyd.

198.    On March 21, 2021, the ALPA filed another grievance with Delta regarding Plaintiff Ratfield being forced to work with Dr. Kozarksy.

199.    Delta did not require Plaintiff Ratfield to undergo alcohol treatment prior to her complaints of sexual harassment and gender discrimination.

200.    Plaintiff Ratfield never had any alcohol related incidents while performing work for Delta or outside of her employment Delta. Plaintiff Ratfield also voluntarily entered the HIMS program.

201.    Delta retaliated against Plaintiff Ratfield for her complaints of gender discrimination and sexual harassment by forcing her to undergo faux alcoholic rehabilitation treatment, attempting to terminate her, and demoting her from Captain to First Officer in violation of Title VII, the NYSHRL, the NYCHRL, and the MHRA.

202.    Delta discriminated against Captain Ratfield on the basis of her gender by refusing to accept her secondary negative alcohol tests despite accepting secondary tests of male pilots and by refusing to allow her to be seen by a female HIMS AME in violation of Title VII, the NYSHRL, and the NYCHRL.

203.    Delta Discriminated against Plaintiff Ratfield on the basis of her status as a victim of sexual assault by forcing her to undergo faux alcoholic rehabilitation treatment, attempting to terminate her, and demoting her from Captain to First Officer in violation of the NYCHRL.

204.    Delta unlawfully subjected Plaintiff Ratfield to ongoing sexual harassment throughout her employment with it and it failed to take any corrective action in response to her complaints in violation of Title VII and the MHRA.

205.    Delta's violations of Title VII, the NYSHRL, the NYCHRL, and the MHRA were willful as it has more than adequate knowledge of the foregoing statutes and their requirements.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION FOR A VIOLATION OF
### Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000e-3
### (Retaliation)

206.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

207.    Plaintiffs engaged in protective activity by complaining to Delta that its conduct violated Title VII by subjecting them to a sexually hostile work environment.

208.    Delta retaliated against Plaintiffs by forcing them to undergo faux medical treatment and examinations.

209.    Delta further retaliated against Plaintiff Degove by terminating her and Plaintiff Ratfield by attempting to terminate her and demoting her.

210.    Had Delta not retaliated against Plaintiffs, they would have performed work respectively as a Captain and a Flight Attendant on behalf of Delta within Queens, New York.

211.    Delta's conduct was in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3.

### AS AND FOR A SECOND CAUSE OF ACTION FOR A VIOLATION OF
### The New York State Human Rights Law § 296
### (Retaliation)

212.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

213.    Plaintiffs engaged in protective activity by complaining to Delta that its conduct violated NYSHRL by subjecting them to a sexually hostile work environment.

214.    Delta retaliated against Plaintiffs by forcing them to undergo faux medical treatment and examinations.

215.    Delta further retaliated against Plaintiff Degove by terminating her and Plaintiff Ratfield by attempting to terminate her and demoting her.

216.    Delta's retaliatory conduct negatively affected Plaintiffs' employment within New York State.

217.    Delta's conduct was in violation of the New York State Human Rights Law § 296.

## AS AND FOR A THIRD CAUSE OF ACTION FOR A VIOLATION OF
### The New York City Human Rights Law § 8-107
### (Retaliation)

218.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

219.    Plaintiffs engaged in protective activity by complaining to Delta that its conduct violated NYCHRL by subjecting them to a sexually hostile work environment.

220.    Delta retaliated against Plaintiff by forcing them to undergo faux medical treatment and examinations.

221.    Delta further retaliated against Plaintiff Degove by terminating her and Plaintiff Ratfield by attempting to terminate her and demoting her.

222.    Delta's retaliatory conduct negatively affected Plaintiffs' employment within New York City.

223.    Delta's conduct was in violation of the New York City Human Rights Law § 8-107.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR A VIOLATION OF
### The Minnesota Human Rights Act
### (Retaliation)

224.    Plaintiff Ratfield repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

225.     Plaintiff Ratfield engaged in protective activity by complaining to Delta that its conduct violated MHRA by subjecting her to a sexually hostile work environment and discrimination.

226.     Delta retaliated against Plaintiff Ratfield by demoting her while she was based out of St. Paul, Minnesota.

227.     Delta's conduct was in violation of the Minnesota Human Rights Law.

### AS AND FOR A FIFTH CAUSE OF ACTION FOR A VIOLATION OF
### Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000e-2
### (Discrimination)

228.     Plaintiff Ratfield repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

229.     Plaintiff Ratfield is a female and is thus a member of a protected class under Title VII.

230.     Delta discriminated against Plaintiff Ratfield on the basis of gender by refusing to accept her secondary negative alcohol test results despite accepting negative secondary test results of similarly situated male pilots. This discriminatory treatment had a direct adverse effect on her income with Delta and resulted in a demotion.

231.     Had Delta not discriminated against Plaintiff Ratfield, would have performed work as a Captain on behalf of Delta within Queens, New York.

232.     Delta's conduct was in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

**AS AND FOR A SIXTH CAUSE OF ACTION FOR A VIOLATION OF**
**The New York State Human Rights Law § 296**
**(Discrimination)**

233.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

234.    Plaintiff Degove is a victim of domestic violence and is thus a member of a protected class under the NYSHRL.

235.    Plaintiff Ratfield is a female and is thus a member of a protected class under the NYSHRL.

236.    Delta discriminated against Plaintiff Degove on the basis of being a victim of domestic violence by forcing her to undergo faux medical treatment and examinations.

237.    Delta further discriminated against Plaintiff Degove on the basis of being a victim of domestic violence by terminating her.

238.    Delta discriminated against Plaintiff Ratfield on the basis of gender by refusing to accept her secondary negative alcohol test results despite accepted negative secondary test results of similarly situated male pilots. This discriminatory treatment had a direct adverse effect on her income with Delta and resulted in a demotion.

239.    Delta's discriminatory conduct had an adverse effect on Plaintiffs' employment within New York State.

240.    Delta's conduct was in violation of the New York State Human Rights Law § 296.

**AS AND FOR A SEVENTH CAUSE OF ACTION FOR A VIOLATION OF**
**The New York City Human Rights Law § 8-107**
**(Discrimination)**

241.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

242.     Plaintiff Degove is a victim of domestic violence/sex offenses and is thus a member of a protected class under the NYCHRL.

243.     Plaintiff Ratfield is a victim of sex offenses and is thus a member of a protected class under the NYCHRL

244.     Delta discriminated against Plaintiffs on the basis of being a victim of domestic violence/sex offenses by forcing them to undergo faux medical treatment and examinations.

245.     Delta further discriminated against Plaintiff Degove on the basis of being a victim of domestic violence by terminating her by terminating her and Plaintiff Ratfield by demoting her.

246.     Delta further discriminated against Plaintiff Ratfield on the basis of gender by refusing to accept her secondary negative alcohol test results despite accepted negative secondary test results of similarly situated male pilots. This discriminatory treatment had a direct adverse effect on her income with Delta and resulted in a demotion.

247.     Delta's discriminatory conduct had an adverse effect on Plaintiffs' employment within New York City.

248.     Delta's conduct was in violation of the New York City Human Rights Law § 8-107.

**AS AND FOR AN EIGHTH CAUSE OF ACTION FOR A VIOLATION OF**
**Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000e-2**
**(Sexual Harassment)**

249.     Plaintiff Ratfield repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

250.     Throughout Plaintiff Ratfield's employment with Delta, including within the applicable statute of limitations, she was subjected to ongoing severe or pervasive sexual harassment.

251.    Despite Plaintiff Ratfield's complaints of being sexually harassed, Delta failed to take any remedial action. The sexual harassment continued after her repeated complaints of it including an unlawful incident in March 2021.

252.    Delta subjected Plaintiff Ratfield to unlawful sexual harassment.

253.    Plaintiff Ratfield was subjected to sexual harassment while she was based out of New York City.

254.    The sexual harassment Plaintiff Ratfield was subjected to is ongoing and continuous.

255.    Delta's conduct was willful and in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

### AS AND FOR A NINETH CAUSE OF ACTION FOR A VIOLATION OF
### Minnesota Human Rights Act
### (Sexual Harassment)

256.    Plaintiff Ratfield repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

257.    Throughout Plaintiff Ratfield's employment with Delta, including within the applicable statute of limitations, she was subjected to ongoing severe or pervasive sexual harassment.

258.    Despite Plaintiff Ratfield's complaints of being sexually harassed, Delta failed to take any remedial action. The sexual harassment continued after her repeated complaints of it including an unlawful incident in March 2021, while she was based in Saint Paul, Minnesota.

259.    Delta subjected Plaintiff Ratfield to unlawful sexual harassment.

260.    The sexual harassment Plaintiff Ratfield was subjected to is ongoing and continuous.

261.    Delta's conduct was willful and in violation of the Minnesota Human Rights Act.

**AS AND FOR A TENTH CAUSE OF ACTION FOR A VIOLATION OF**
**The Americans with Disabilities Act, 42 U.S.C. § 12112**
**(Disability Discrimination)**

262.    Plaintiff Degove repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

263.    Plaintiff Degove suffers from dyslexia which substantially impairs her ability to write.

264.    Plaintiff Degove requested a reasonable accommodation for her dyslexia for extra time and assistance with her training.

265.    Plaintiff Degove was denied an accommodation for her dyslexia and Delta failed to engage in the interactive process regarding her request for an accommodation.

266.    Delta's conduct was willful and in violation of the Americans with Disabilities Act, 29 U.S.C. § 12112.

**AS AND FOR AN ELEVENTH CAUSE OF ACTION FOR A VIOLATION OF**
**The New York State Human Rights Law § 296**
**(Disability Discrimination)**

267.    Plaintiff Degove repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

268.    Plaintiff Degove suffers from dyslexia which substantially impairs her ability to write.

269.    Plaintiff Degove requested a reasonable accommodation for her dyslexia for extra time and assistance with her training.

270.    Plaintiff Degove was denied an accommodation for her dyslexia and Delta failed to engage in the interactive process regarding her request for an accommodation.

271.    Delta's conduct was willful and in violation of the New York State Human Rights Law § 296.

## AS AND FOR A TWELFTH CAUSE OF ACTION FOR A VIOLATION OF
### The New York City Human Rights Law § 8-107
### (Disability Discrimination)

272.    Plaintiff Degove repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

273.    Plaintiff Degove suffers from dyslexia which substantially impairs her ability to write.

274.    Plaintiff Degove requested a reasonable accommodation for her dyslexia for extra time and assistance with her training.

275.    Plaintiff Degove was denied an accommodation for her dyslexia and Delta failed to engage in the interactive process regarding her request for an accommodation.

251.    Delta's conduct was willful and in violation of the New York City Human Rights Law § 8-107.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Delta as follows:

A.      Preliminary and permanent injunctions against Delta and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

B.      Training on the subject of employment discrimination for all of Delta's employees;

C.      Diversity training for all supervisors and managers conducted by reputable outside vendors;

D.      Supervisory discipline up to and including termination for any supervisor and managers who engages in unlawful discrimination;

E.      Active monitoring of the work areas to ensure compliance with discrimination policies;

F.      Monitoring by the Court of a Federal Agency to ensure that Delta complies with all injunctive relief;

G.      A judgment declaring that the practices complained of herein are unlawful and in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, the New York State Human Rights Law, the New York City Human Rights Law, the Americans With Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, and the Minnesota Human Rights Act;

H.      All damages which Plaintiffs have sustained as a result of Delta's conduct, including back pay, general and special damages for lost compensation and job benefits they would have received but for Delta's unlawful discriminatory and retaliatory conduct, front pay, reinstatement, punitive damages, attorneys' fees, interest, and compensatory damages including for emotional distress humiliation, embarrassment, and anguish;

I.      An award to Plaintiffs of pre-judgment interest at the highest level rate, from and after the date of service of the initial complaint in this action on all unpaid wages from the date such wages were earned and due;

J.      An award to Plaintiffs representing Delta's share of FICA, FUTA, state unemployment insurance, and any other required employment taxes;

K.      Awarding Plaintiff their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs;

L.      Pre-judgment and post-judgment interest, as provided by law; and

M.      Granting Plaintiffs other and further relief as this Court finds necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by this complaint.

Dated:          June 25, 2021
                Garden City, New York

                                        Respectfully submitted,

                                        */s/ Robert J. Valli, Jr.*
                                        Robert J. Valli, Jr.
                                        rvalli@vkvlawyers.com
                                        Sara Wyn Kane
                                        skane@vkvlawyers.com
                                        Alexander M. White
                                        awhite@vkvlawyers.com
                                        **Valli Kane & Vagnini LLP**
                                        600 Old Country Road, Suite 519
                                        Garden City, New York 11530
                                        T: (516) 203-7180
                                        F: (516) 706-0248

                                        Jay D. Ellwanger
                                        (*pro hac vice application forthcoming*)
                                        jellwanger@equalrights.law
                                        Holt Lackey
                                        (*pro hac vice application forthcoming*)
                                        Hlackey@equalrights.law
                                        **Ellwanger Law LLLP**
                                        8310-1 N. Capital of Texas Hwy, Suite 190
                                        Austin, Texas 78731
                                        Telephone: (737) 808-2262

                                        *Attorneys for Plaintiffs*